UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| YAHAIRA MUNOZ, | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:19-cv-1793-MPS |
| | : | |
| v. | : | |
| | : | |
| JLO AUTOMOTIVE, INC. d/b/a | : | JANUARY 29, 2019 |
| EXECUTIVE KIA, | : | |
| Defendant | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT**

### I.      INTRODUCTION

This is a suit brought by a consumer regarding the purchase and financing of a

motor vehicle.  Plaintiff brings this action to recover actual, statutory, and punitive

damages, reasonable attorney's fees, and costs from the defendant, JLO Automotive,

Inc. d/b/a Executive Kia ("Executive Kia"), for violations of the Truth in Lending Act, 15

U.S.C. § 1601 *et seq.* ("TILA"), the Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et

seq.* ("EFTA"), and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-

110a *et seq.* ("CUTPA")[1].

### II.      STANDARD OF REVIEW

In *GE Group Life Assurance Company v. Ruzynski*,[2] the principles applicable to

entry of a judgment following default were well-summarized as follows:

> It is well established that a party is not entitled to a default judgment as of
> right; rather the entry of a default judgment is entrusted to the sound judicial

---

[1] Plaintiff abandons her Fair Credit Reporting Act ("FCRA") claims.
[2] 2004 WL 243346 (D. Conn. 2004).

discretion of the court.[3] In civil cases, however, "where a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party."[4]

In deciding the extent of damages to be awarded in a default judgment, the court must consider several factors including (1) the monetary award requested; (2) the prejudice suffered by the Plaintiff; (3) whether or not the default is clearly established and (4) the nature of the Plaintiff's claims against the defendant.[5]

With respect to the above criteria, the Second Circuit has provided guidance, stating:

> The outer bounds of recovery allowable are of course measured by the principle of proximate cause. The default judgment did not give [Plaintiffs] a blank check' to recover from [defendant] any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded....[6]

"[W]here the quantum of damages is not liquidated and is not a readily ascertainable sum, the plaintiff must prove damages before the entry of a final default judgment."[7] "In reaching the decision as to the amount a plaintiff is entitled to recover, the Court may rely on detailed affidavits or documentary evidence to determine the appropriate sum [to be awarded pursuant to] the default judgment."[8] "A court may enter a default judgment

---

[3] *Id.* citing *Cablevision of S. Conn. Ltd. Partnership v. Smith*, 141 F.Supp.2d 277, 281 (D. Conn. 2001) (quoting *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir.1999)).
[4] *Id.* citing *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir.1984).
[5] *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1152 n. 11 (2d Cir. 1995) (citing 10 Moore's Federal Practice § 55.20[2][b]).
[6] *Greyhound Exhibit Group, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992).
[7] *Montcalm Pub. Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992)
[8] (Internal quotation marks omitted.) *Teamsters Local 639-Employers Health Tr. v. Boiler & Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 107 (D.D.C. 2008).

without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation."[9]

However, in making this determination and evaluating the allegations asserted against the defendant, the court may "deem[ ] all the well-pleaded allegations in the pleadings to be admitted" by the defendant.[10]

### III.    FACTUAL ALLEGATIONS

The following facts are set forth in the Complaint and admitted by the Defendants in default, or they are contained in Plaintiff's sworn Affidavit or the Affidavit of Attorney Brendan Mahoney.

On or about November 30, 2018, Plaintiff visited Executive Kia interested in purchasing a used vehicle.[11] Executive Kia arranges financing for more than 25 transactions in a calendar year and is a "creditor" within the meaning of TILA.[12] Plaintiff found a 2011 Chevrolet Equinox (the "Vehicle") that met her requirements.[13] She was interested in the Vehicle and was told by a salesman, "Michael Crespo" ("Crespo"), that other people were interested in it, too. If she wanted to purchase the Vehicle, she needed to pay a deposit that evening and she could return later to execute all the paperwork, since the dealership was closing soon. She agreed and paid a $1,100 deposit and agreed to purchase it for a cash price of $11,107.[14] She was not presented

---

[9] *Hunt v. Inter–Globe Energy, Inc.*, 770 F.2d 145, 148 (10th Cir.1985)(*citing Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir.1983))
[10] *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997).
[11] Muñoz Affidavit, ¶ 3.
[12] *See* Mahoney Affidavit.
[13] Muñoz Affidavit, ¶ 4.
[14] Id., ¶¶ 5-6.

with a purchase order or any purchase documents at that time.[15] Plaintiff returned on

December 1, 2018 to complete the transaction and execute the necessary paperwork.[16]

Crespo presented with the purchase documents, which included the purchase order.[17]

The purchase order states "NO REFUND OF DEPOSIT".[18] Plaintiff was surprised that

the price increased so much over the cash price. Plaintiff understood that I would have

to pay interest, but also noticed that that Executive Kia had also added GAP insurance

at a cost of $752.[19] Plaintiff questioned the GAP charge and Crespo told her that GAP

insurance was a mandatory component of the transaction. It was part of their "low

income program".[20] While Plaintiff did not want to pay this extra charge, Executive Kia

already had her deposit, she needed a Vehicle, and Plaintiff was told that I did not have

an option to refuse the charge.[21]

     Plaintiff planned to finance the remaining balance pursuant to a retail installment

sales contract (the "Contract").[22] As Plaintiff was reviewing the Contract with "Joe", a

member of the Executive Kia finance staff, she again questioned a $752 charge for

GAP.[23] Joe responded that GAP insurance was a mandatory component of the

transaction.[24]

     "GAP insurance" is an addendum to a retail installment sales contract, which

provides that, subject to certain conditions and limitations, in the event of a total loss of

the Vehicle the holder of the contract will accept the insurance proceeds in full

---

[15] Id., ¶ 8.
[16] Id., ¶ 9.
[17] Id., ¶ 10, Exhibit 1.
[18] Id., ¶ 12, Exhibit 1.
[19] Id., ¶ 13.
[20] Id., ¶ 14.
[21] Id., ¶ 15.
[22] Id., ¶ 16, Exhibit 2.
[23] Id., ¶ 17.
[24] Id., ¶ 18.

satisfaction of the outstanding balance owed on the contract. A GAP addendum, or "GAP insurance", would be present only in a financed transaction.[25] Plaintiff was not interested in purchasing GAP insurance, but she decided to proceed with the transaction and to pay the cost because she believed that it was mandatory.[26]

Joe also asked Plaintiff to provide her checking account information so that the assignee of the retail installment contract, non-party Credit Acceptance Corporation ("CAC"), could make automatic withdrawal from her bank account.[27] Plaintiff did not want to enroll in automatic withdrawals, but Joe told her that CAC required that she agree to do so as a condition of financing.[28]

Joe also told Plaintiff that the GAP insurance and automatic withdrawals were part of Executive Kia's "low income program" and that was why she was required to agree to these items if she wished to finance the transaction.[29] In reliance on Joe's statement, Plaintiff completed the transaction with the GAP insurance and electronic withdrawals, and executed the contract documents, including the retail installment sales contract, and took delivery of the Vehicle.[30]

---

[25] Credit Karma, "What is GAP Insurance?" available online at https://www.creditkarma.com/auto/i/what-is-gap-insurance/. (Last accessed January 28, 2020)
[26] Muñoz Affidavit, ¶¶ 17-19.
[27] Id., ¶ 20.
[28] Id., ¶ 21, Exhibit 3.
[29] Id., ¶ 23.
[30] Id., ¶ 24.

## IV.   PLAINTIFFS' LEGAL CLAIMS

### a.  Truth in Lending Act

TILA is a remedial, strict liability statute that is to be liberally construed, and it requires no proof of deception or actual damages to obtain relief thereunder.[31]  Any defects in the disclosure process, even technical defects, must be recognized without requiring any proof that the consumer was confused.[32]

TILA requires creditors to disclose clearly and accurately to consumers any finance charge that the consumer will bear under the credit transaction. See 15 U.S.C. § 1638(a)(3). The regulations implementing TILA, known as "Regulation Z," define "finance charge" to include "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction." C.F.R. § 226.4(a). Thus, any cost imposed directly or indirectly upon a consumer as a condition of financing is ordinarily considered a finance charge unless subject to some exception.

Consequently, the cost of the GAP is considered a finance charge if a consumer is required to purchase it as an incident to or a condition of the extension of credit, because GAP is sold only in financed transactions and could not be sold in a cash transaction.[33] In this situation, Plaintiff was told that to finance a vehicle under the "low

---

[31] *Purtle v. Eldridge Auto Sales*, 91 F.3d 797, 800 (6th Cir. 1996); *McGowan v. King, Inc.,* 569 F.2d 845, 848-49 (5th Cir. 1978); *Redhouse v. Quality Ford Sales, Inc.*, 523 F.2d 1, 2 (10th Cir. 1975) (en banc).
[32] *See Jenkins v. Landmark Mortgage Corp.*, 696 F. Supp. 1089, 1092, 1095 (W.D. Va. 1988) (citing *Powers v. Sims and Levin*, 542 F.2d 1216, 1219 (4th Cir. 1976)).
[33] GAP is treated in the same manner as any credit insurance, i.e., it is considered to be a financed charge unless it meets the requirements for exclusion of the charge. Reg. Z § 1026.4(b)(10). In order to be excluded, the GAP cannot be required by the creditor. 15 U.S.C. § 1605(b)(1); Reg. Z §

income program", she must purchase GAP. The cost of the GAP was therefore incidental to the extension of credit, and it meets the requirements for a finance charge.

Indeed, there is law specifically relating to the disclosure of GAP under the amount financed or finance charge. "'Finance charges' can include debt cancellation coverage, such as GAP insurance. Under Regulation Z … debt cancellation fees may be excluded from a finance charge in a car purchase if three requirements are met: A) the debt cancellation coverage is not required by the creditor and this fact is disclosed in writing; B) the fee or premium for the initial term of coverage is disclosed; and C) the consumer signs or initial an affirmative written request for coverage after being given the previous two disclosures. … Under TILA, all disclosures made under these requirements must also be clear and conspicuous."[34] All three of these requirements must be met and Plaintiff was told that GAP was *required*, thus rendering GAP a finance charge within the scope of Regulation Z. That any of the contract documents state that the GAP was optional is irrelevant if the entity providing Plaintiff with credit tells her that the GAP is mandatory.

Although the cost of GAP is considered a finance charge under these circumstances, Executive Kia did not disclose the cost as part of the finance charge, and it did it not include the cost it its calculation of the annual percentage rate. Instead, Executive Kia included the cost of the GAP as part of the amount financed. In doing so, it violated 15 U.S.C. § 1638(a)(2)(requiring the accurate itemization of amount

---

1026.4(d)(1)(i). A review of the retail installment contract confirms that the original creditor was Executive Kia. And, as discussed above, Executive Kia required the inclusion of the GAP.
[34] Rodriguez v. Lynch Ford, Inc., No. 03 C 7727, 2004 WL 2958772, at *10 (N.D. Ill. 2004) *citing* 12 C.F.R. § 226.4(d)(3)(i).

financed), 1638(a)(3) (requiring disclosure of the finance charge), and 1638(a)(4) (requiring disclosure of annual percentage rate).

Executive Kia violated TILA, because the GAP was improperly disclosed as part of the amount financed instead of as part of the finance charge. The actual APR in this transaction is almost significantly higher than what was actually disclosed (21.89% vs. 19%).[35] If the TILA disclosures were accurate, Plaintiff could have made a more meaningful decision about credit and financed the purchase elsewhere.

TILA applies to Executive Kia, because it is a "creditor" within the meaning of TILA and is the original creditor on the Contract. Plaintiff is entitled to recover actual damages and statutory damages of double the finance charge (capped at $2,000) pursuant to 15 U.S.C. § 1638(a)(2)(A)(ii).  TILA also provides for a mandatory award of attorney's fees.[36]

### b.  Electronic Funds Transfer Act

Executive Kia violated EFTA by requiring Plaintiff to set up automatic withdrawals of the install contract payments as a condition of financing the Vehicle. Executive Kia, which was the original creditor under the retail installment contract,[37] violated EFTA, 15 U.S.C. § 1693k, which prohibits creditors from conditioning the extension of credit upon the borrower's consent to repayment by preauthorized electronic transfers.

---

[35] See attached APR calculation, Exhibit A.

[36] 15 U.S.C. § 1640(a)(3).  *See also Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 n.5, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978) (interpreting similar language involving Title VII); *Diaz v. Paragon Motors of Woodside, Inc.*, No. CV-03-6466 CPS RML, 2007 WL 2903920, at *7 (E.D.N.Y. Oct. 1, 2007) *citing Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 188 (4th Cir. 2007).

[37] Munoz Affidavit, Exhibit 1.

Section 1693k(1) states that no person may "condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." As stated above, Executive Kia told Plaintiff that she must allowed CAC to make automatic, pre-authorized withdrawals from her bank account as part of its "low income program", which is precisely the conduct prohibited by § 1693k. By requiring this, Plaintiff was denied the flexibility of deciding when during the month she made her payments or from where.

Executive Kia is liable under 15 U.S.C. § 1693m for statutory damages of between $100 and $1,000 plus attorney's fees and costs.  Plaintiffs request the maximum award of $1,000. In deciding that amount of statutory damages to award under EFTA, courts "must consider the frequency and persistence of [the creditor's] noncompliance, the nature of such noncompliance, and the extent to which the noncompliance was intentional."[38] Here, the withdrawals do not appear to be part of an isolated incident, as there were termed as part of the "low income program", so it would follow that Executive Kia is employing the same illegal requirement with some or all of its non-prime or subprime borrowers when it arranges credit. And since it deems this as part of the "program", it is doubtless that the conduct was intentional.

Plaintiff is entitled to recover the costs of the action should she prevail on this cause of action irrespective of the amount of statutory damages awarded.[39]

---

[38] (Internal citations and quotation marks omitted.) *Alexis v. PMM Enterprises LLC*, No. 3:17-CV-1622 (MPS), 2018 WL 5456491, at *3 (D. Conn. 2018).

[39] "The Court therefore awards Plaintiffs $100 in statutory damages for violations of EFTA together with the costs of the action; and having prevailed, Plaintiffs may file a motion for attorney's fees." *James v. Lopez Motors, LLC*, No. 3:16-CV-835 (VLB), 2018 WL 1582552, at *4  (D. Conn. March 31, 2018); *Alexis*, supra at *3.

### c.  Connecticut Unfair Trade Practices Act

Connecticut courts use the "cigarette test"[40] in determining whether a trade

practice is unfair under CUTPA:

> It is well settled that in determining whether a practice violates CUTPA we have
> adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade
> [C]ommission for determining when a practice is unfair: (1) [W]hether the
> practice, without necessarily having been previously considered unlawful, offends
> public policy as it has been established by statutes, the common law, or
> otherwise—in other words, it is within at least the penumbra of some common
> law, statutory, or other established concept of unfairness; (2) whether it is
> immoral, unethical, oppressive, or unscrupulous; (3) whether it causes
> substantial injury to consumers, [competitors or other businesspersons].... All
> three criteria do not need to be satisfied to support a finding of unfairness. A
> practice may be unfair because of the degree to which it meets one of the criteria
> or because to a lesser extent it meets all three.... Thus a violation of CUTPA may
> be established by showing either an actual deceptive practice ... or a practice
> amounting to a violation of public policy.... In order to enforce this prohibition,
> CUTPA provides a private cause of action to [a]ny person who suffers any
> ascertainable loss of money or property, real or personal, as a result of the use
> or employment of a [prohibited] method, act or practice....[41]

Executive Kia' statutory violations of TILA and EFTA invoke the "public policy" prong of

an unfair trade practice.

Executive Kia's TILA and EFTA violations as described above are also CUTPA

violations in that they offend the public policy prong of the cigarette test. The

Connecticut Supreme Court held in *Cheshire Mortg. Service, Inc. v. Montes*[42] that a

TILA violation may also constitute a CUTPA violation if the consumer can show

---

[40] *See FTC v. Sperry & Hitchinson Co.,* 405 U.S. 233 (1972).
[41] *Ulbrich v. Groth*, 310 Conn. 375, 409–10, 78 A.3d 76, 100 (2013)
[42] 223 Conn. 80, 114 (1992)

substantial injury, generally in the form of a monetary loss.[43] More succinctly, the TILA violation must rise above a disclosure violation. In the instant matter, the mandatory GAP, which was charged incidentally to the extension of credit constituted a substantially injury in the form of monetary loss to Plaintiff. It was improperly disclosed, or "buried" in the cost of the goods, and would have not been paid in a similar cash transaction. By burying the cost in the price, Plaintiff was deprived of a meaningful opportunity to compare credit terms. Indeed, it was not properly disclosed that she was required to pay more than the legal APR limit in Connecticut.[44]

A violation of EFTA "offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness"[45], which would satisfy the public policy prong of the cigarette test. For example, in *Langan v. Johnson & Johnson Consumer Companies, Inc.*[46] the Connecticut district court concluded that although courts in this state had not previous recognized that a violation of the Federal Food, Drug and Cosmetic Act ("FDCA") could establish a CUTPA claim; it was a violation of an established public policy. Therefore, Plaintiff could proceed with a CUTPA case premised on a FDCA violation. Similarly, an EFTA violation constitutes an

---

[43] *Id.,* 113.

[44] "A retail seller of motor vehicles may charge, contract for, receive or collect a finance charge expressed as an annual percentage rate on any retail installment contract covering the retail sale of a motor vehicle in this state, which charge shall not exceed … on sales made on or after October 1, 1987… used motor vehicles of a model designated by the manufacturer by a year more than two years prior to the year in which the sale is made, nineteen per cent." Conn. Gen. Stat. § 36a-772.

[45] *Ulbrich,* supra.

[46] 95 F. Supp. 3d 284, 290 (D. Conn. 2015) ("[P]laintiff has sufficiently pleaded a claim that defendant's statements are unfair in violation of CUTPA. First, plaintiff plausibly alleges that defendant's statements offend an established public policy: the FDCA's prohibition on sunscreen 'labeling [that] is false or misleading in any particular.'")

offense to public policy which creates liability under CUTPA even though such liability

has not previously been considered or recognized.

Courts have also recognized that TILA violations may serve as the basis for *per

se* violations under § 42-110-28(b)(23)[47]: "Because the court in this case found that

Atlantic violated TILA and RISFA, the court finds there is sufficient evidence that Atlantic

engaged in unfair and deceptive acts in commerce or trade in connection with this

transaction in violation of CUTPA."[48] The *Tirado* court reasoned:

> § 42-110b-28(b)(23) of the Regulations of Connecticut State Agencies provides:
> "It shall be an unfair or deceptive act or practice for a new car dealer or a used
> car dealer to violate any provision of a federal or state statute or regulation
> concerning the sale or lease of motor vehicles." "The Connecticut Supreme Court
> has held ... that violations of the Federal Truth in Lending Act and of General
> Statutes § 36-224l (limiting charges on secondary mortgage loans) are unfair
> trade practices in violation of CUTPA ... A plaintiff who can establish a violation of
> either of these statutes does not need to allege or prove a violation of CUTPA in
> order to obtain substantive relief. If the plaintiff's lawyer is worth her salt,
> however, the complaint will additionally allege a CUTPA violation, because
> General Statutes § 42-110g(d) allows the court to award reasonable attorneys
> fees to the successful plaintiff."[49]

*Tirado* bears close similarity to the instant matter in that Ms. Tirado's claims also

involved a financing agreement with an improperly disclosed financing term (vendor's

single interest insurance) and a retail installment sales contract with a 19% APR. The

---

[47] Section 42–110b(c) of CUTPA provides that the Department of Consumer Protection (the 'DCP') may
issue regulations that establish what acts, practices, or methods shall be deemed unfair or deceptive
under CUTPA. Section 42-110-28(b)(23) states "[I]t shall be an unfair or deceptive act or practice for a
new car dealer or a used car dealer to violate any provision of a federal or state statute or regulation
concerning the sale or lease of motor vehicles."
dealer to violate any provision of a federal or state statute or regulation concerning the sale
or lease of motor vehicles.
[48] (Footnote omitted.) *Tirado v. Ofstein*, No. HHDCV054014648S, 2008 WL 902506, at *16 (Conn. Super.
Ct. 2008).
[49] *Id.*, at *15 *citing Pechiney Corp. v. Crystal,* 43 Conn. Supp. 91, 99-100, 643 A.2d 319 (1994) [10 Conn.
L. Rptr. 606]*, overruled in part on other grounds by Jade Aircraft Sales v. Crystal,* 236 Conn. 701, 674
A.2d 834 (1996).

*Tirado* court also found that the disclosure violation and an APR exceeding 19% violated TILA.[50]

Further, Executive Kia's conduct in which it secured a non-refundable deposit before disclosing all the terms of finance constitutes a CUTPA violation according to the Connecticut Appellate Court. In *Freeman v. A Better Way Wholesale Autos,* Inc.[51], the panel unanimously upheld the trial court's decision that a dealership violated CUTPA when it conditioned the financing of a motor vehicle upon the purchasing of unwanted extras.[52] And, although the Truth in Lending Act was not directly involved in the *Freeman* case because the plaintiff, unlike here, did not proceed with the purchase, the Appellate Court upheld Judge Huddleston's holding that ABW had violated the policy embodied in TILA by failing to disclose financing terms.[53]

Executive Kia also violated Conn. Gen. Stat. § 14-62(b)(2) by including in the purchase order, the GAP addendum, that was not specifically ordered by the buyer. She did not want to purchase it, but nevertheless was required to do so, because she was told it was mandatory. She claims the $752 cost as damages. As stated above, regulations regarding the conduct of car dealerships issued by the DCP provide that it is a *per se* violation for a car dealership to fail to comply with a state or federal law concerning the sale of motor Vehicles. Conn. Agency Reg. § 42–110b–28(b)(23).

---

[50] *Id.* at *2; *See also Alexis v. PMM Enterprises LLC,* supra at *6 ("If Empire had included the $1,100 bank fee in the finance charge as required by the TILA, the APR for the Alexises contract would have risen above the statutory maximum rate. Empire's misrepresentation of the purchase price of the vehicle not only violated the TILA, then, it also allowed Empire to obscure a violation of Connecticut's Retail Installment Sales Financing Act ('RISFA').")
[51] 174 Conn. App. 649 (2017)
[52] *Id.* at 669-670.
[53] *Id.* at 654.

Finally, Executive Kia's conduct of calling these terms of the transaction as part of the "low income program" is deceptive and unfair. It gives the impression to consumers that this conduct is something that is helping them, rather than being something that is in violation of federal consumer protection statutes. Executive Kia's terminology here gives a false impression and makes it less likely the consumers will seek redress from the violations.

As a result of Executive Kia's conduct, Plaintiff has suffered ascertainable losses of money or property in that they was charged $752 for GAP addendum she did not desire and lost the flexibility for the timing of payments to CAC that she would otherwise enjoy. Plaintiff claims the $752 plus the finance charges thereon as damages.

For Executive Kia's violations of CUTPA, Plaintiff is entitled to her actual damages plus punitive damages and a reasonable attorney's fee.[54]

### V.    Punitive Damages

"[T]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law... [including] punitive damages and attorney's fees. Section 42– 110g does not specify how punitive damages are to be measured; however, the award should serve the broad remedial goals of eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices."[55]

---

[54] Conn. Gen. Stat. §42-110g(d).
[55] (Internal citations and quotation marks omitted.) *Societa Bario E. Derivati v. Kaystone Chem., Inc.*, No. 5:90-CV-599 (EBB), 1998 WL 182563, at *10 (D.Conn. 1998).

Connecticut courts have recognized the deterrent aim of punitive damages by employing a relatively large multiplier in situations where the actual damages are comparatively small. In *Larobina v. Home Depot USA, Inc.*,[56] the appellate court upheld a 10x multiplier when compensatory damages were only $100 on the theory that "CUTPA is aimed at eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices. To achieve that result, CUTPA seeks to create a climate in which private litigants help to enforce the ban on unfair or deceptive trade practices or acts. Encouraging claimants to walk away from unfair or deceptive practices does not serve to help enforce the ban on unfair trade practices and prevents CUTPA from achieving the remedial effect which the legislature desired."[57]

This approach has been similarly recognized in *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn. App. 99, 149 (2011) (6x multiplier); *Benham v. Wallingford Auto Park, Inc.*, No. CV020459418S, 2003 WL 22905163, at *5 (7x multiplier); *Odell v. Wallingford Mun. Fed. Credit Union*, No. CV106012228S, 2013 WL 4734783, at *45 (3x punitive damages under CUPTA on top of 3x civil theft multiplier); *All Am. Custom Pools & Spas v. Schwindeman,* No. FSTCV044001335S, 2007 WL 866238, at *6. (Conn. Super. Ct. March 9, 2007) ($1 compensatory damages and $25,000 punitive damages).

Executive Kia's conduct in this case was particularly egregious and warrants an award of punitive damages to Plaintiff. It misrepresented its "low income program" as something intended to provide a service, but was instead used to add unwanted extras to the deal and force automatic withdrawals. This program is likely wielded against other

---

[56] 76 Conn.App. 586 (2003).
[57] *Id.* at 596.

low income consumers and it only serves the purpose of making transaction more expensive for them without any benefit. Moreover, Executive Kia's in securing the deposit before disclosing "mandatory" extra costs has been found specifically to be a CUTPA violation by the Connecticut Appellate Court. Punitive damages of $5,000 are warranted in order deter future conduct of this type.

## VI.  Attorney's Fees

Plaintiffs are entitled to an award of a reasonable attorney's fee and costs under TILA, EFTA and CUTPA.

Consumers are to be awarded TILA attorney fees in "any successful action."[58] The award, pursuant to TILA, is mandatory.[59] Because the federal and state governments lack the resources to adequately police the marketplace and to protect consumers, federal and state consumer protection laws depend upon the private enforcement by aggrieved consumers. The ability of consumers to bring such cases depends upon the availability of private attorneys willing to bring these cases against well-heeled businesses. Accordingly, TILA provides that successful litigants are entitled to recover a reasonable attorney's fee based upon the work performed in the case. The availability of such fees enable private attorneys to handle cases that involve small dollar amounts but which raise complex legal issues.

Attorney's fees and costs are also mandatory under EFTA: "[I]n the case of any successful action to enforce the foregoing liability, [any person who fails to comply with

---

[58] 15 U.S.C. § 1640(a)(3).
[59] *Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 n.5, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978)(Title VII).

provisions of this subchapter is liable to the consumer for] the costs of the action, together with a reasonable attorney's fee as determined by the court."[60]

Plaintiffs are also entitled to fees under CUTPA.  Conn. Gen. Stat. §42-110g(d) provides: "in any action brought by a person under this section, the court may award, to the Claimant, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." The Connecticut Supreme Court has held that a Plaintiff who establishes a CUTPA claim is entitled to attorney's fees. [61]  Specifically, the Court stated, "Since CUTPA expressly permits the court to award 'costs and reasonable attorney's fee based on the work reasonably performed by an attorney' *General Statutes* § 42-110g (d); the [parties claiming CUTPA violations] are clearly entitled to such fees.[62]

The award of attorney's fees is an extremely important component in promoting private enforcement of the CUTPA:

> The policy behind CUTPA, namely, to encourage litigants to act as private attorneys general and to bring actions for unfair or deceptive trade practices, is furthered by our conclusion. Integral to effecting this policy, and reflected in the 1976 amendment, is the desire to encourage attorneys to accept and litigate CUTPA cases. CUTPA cases, however, may entail long hours with little likelihood of an award that will cover reasonable expenses. For this reason, General Statutes § 42-110g (d) offers an attorney who accepts a CUTPA case the prospect of recovering  reasonable fees and costs.[63]

---

[60] 15 U.S.C. § 1693m(a)(3); *see also Bisbey v. D.C. Nat. Bank*, 793 F.2d 315, 318 (D.C. Cir. 1986)
[61] *Barco Auto Leasing Corp. v. House*, 202 Conn. at 120.
[62] *Id. See also* ROBERT M. LANGER ET AL., CONNECTICUT UNFAIR TRADE PRACTICES (2003).
[63] *See Gill v. Petrazzuoli Bros., Inc.*, 10 Conn. App. 22, 33 App. Ct. 1987).  *See also Fabri v. United Techs. Int'l, Inc.*, 193 F. Supp. 2d 480, 486 (D. Conn. 2002), where not awarding attorney's fees, "would be contrary to the purpose of the fee-shifting statute, to encourage the prosecution of meritorious claims

Denying attorney's fees would have a chilling effect and would be contrary to the purpose of the fee-shifting statute.

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,*[64] the Second Circuit clarified the proper analysis for a district court to undertake in exercising its considerable discretion in awarding attorney's fees.  A court is to

> consider, in setting the reasonable hourly rate it uses to calculate the "lodestar," what a reasonable, paying client would be willing to pay…
>
> [I]n determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.[65]

Essentially, the Second Circuit directs district courts to consider panoply factors when considering a fee request:

> The meaning of the term "lodestar" has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness. This opinion abandons its use.[66] We think the better course—and the one most consistent with attorney's fees jurisprudence—is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the

---

for violation of the substantive provisions of CUTPA."; and *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 617, (1981), where recovery of attorneys' fees, "serves to encourage private CUTPA litigation."

[64] 522 F.3d 182 (2d Cir. N.Y. 2008)

[65] *Id.* at 184.

[66] "While we do not purport to require future panels of this court to abandon the term—it is too well entrenched—this panel believes that it is a term whose time has come." (Footnote in original, numbering modified herein.)

Johnson[67] factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.[68]

*Arbor Hill* was a case brought under the Voting Rights Act[69] and involved private local counsel from Albany, New York, a national voting-rights legal non-profit and an experienced, out-of-district firm known for its "muscle" and Second Circuit Appellate work.[70] The thrust of the matter was that the out-of-district firm sought to recoup its fees when billing at its Southern District of New York-level when litigating a case in the Northern District of New York, where the market rate for fees was lower. This district-based analysis of a reasonable fee is called the "forum rule". The Second Circuit in *Arbor Hill* directed courts in this circuit that rather than a mechanistic application of a reasonable rate as determined by the forum rule multiplied the number of hours worked using the lodestar calculation was too limiting of a formula, courts should examine *all* case specific factors, including the *Johnson* factors, in determining the amount of a fee award.[71] The decision urges a philosophical shift from "lodestar" to the "presumptively reasonable fee."[72]

---

[67] The twelve Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974)

[68] *Arbor Hill*, supra at 190.

[69] The Second Circuit's analysis focused on the reputational benefit to counsel, as they accepted the case pro bono at the onset. That factor is inapplicable herein.

[70] *Id.*, at 185.

[71] *Id.,* at 184-185.

[72] *Id.,* at 184.

Plaintiffs will submit their fee claim following an adjudication of this motion pursuant to FRCP 54 (d)(2).

## VII.    DAMAGES

Liquidated Damages

|  |  |  |
|---|---|---|
| GAP charge | $752.00 | |
| Finance Charges on GAP[73] | $372.00 | |
| Subtotal: | | $1,124.00 |

Statutory damages

|  |  |
|---|---|
| TILA: | $2,000.00 |
| EFTA: | $1,000.00 |

Punitive Damages   (CUTPA)                              $5,000.00

Attorney's Fees:                                          TBD


**TOTAL**                                            **$9,124.00**

---

[73] $752 @ 18.99% APR for 54 months (term of Contract) = $372 in interest

## VIII.   CONCLUSION

In light of the foregoing, judgment should enter against Executive Kia in the amount of $9,124.00.

PLAINTIFF, YAHAIRA MUNOZ

By:  /s/ *Daniel S. Blinn*
      Daniel S. Blinn (ct02188)
      Brendan L. Mahoney (ct29839)
      Consumer Law Group, LLC
      35 Cold Spring Road, Suite 512
      Rocky Hill, CT  06067
      (860) 571-0408
      Fax: (860) 571-7457
      dblinn@consumerlawgroup.com
      bmahoney@consumerlawgroup.com

<u>CERTIFICATION</u>

I hereby certify that on January 29, 2020, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

<u>/s/ *Daniel S. Blinn*            </u>
Daniel S. Blinn