UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| YAHAIRA MUÑOZ,<br>*Plaintiff*,<br>v.<br>JLO AUTOMOTIVE, INC. d/b/a EXECUTIVE KIA,<br>*Defendant*. | No. 3:19-cv-01793 (MPS) |

**RULING AND ORDER ON MOTION FOR DEFAULT JUDGMENT**

Plaintiff Yahaira Muñoz brings this action against JLO Automotive, Inc., doing business as Executive Kia ("Executive Kia"). She alleges that Executive Kia violated state and federal consumer protection laws when providing financing for her car purchase. Muñoz served Executive Kia with the complaint on November 13, 2019. ECF No. 1. The following month I granted her motion for default against Executive Kia for failure to respond to the complaint. ECF 9. Muñoz now moves for default judgment in the amount of $9,124.00. ECF No. 11. For the reasons set forth below, the motion is GRANTED in part, DENIED in part, and DENIED without prejudice in part.

**I. FACTUAL BACKGROUND**

On November 28, 2018, Plaintiff, Yahaira Muñoz, visited Executive Kia interested in purchasing a used vehicle. ECF No. 1 ¶ 7. Muñoz decided upon a 2011 Chevrolet Equinox (the "Vehicle") and agreed to purchase it for a cash price of $11,107. *Id.* ¶ 8. On December 1, she returned to Executive Kia to take the next steps to complete the transaction: she agreed to pay a $1,100 down payment and to finance the balance under a retail installment sales contract (the "Contract"). *Id.* ¶¶ 9,10. According to the complaint, as Muñoz was reviewing the Contract with a member of the Executive Kia staff she "questioned a $752 charge for 'GAP insurance'". *Id.* ¶

1

11. In response, the representative informed Muñoz that "GAP insurance was a mandatory component of the transaction." *Id*. ¶ 12. GAP insurance is an addendum to a retail installment sales contract, which provides that, subject to certain conditions and limitations, in the event of a total loss of the vehicle the holder of the contract will accept the insurance proceeds in full satisfaction of the outstanding balance owed on the contract. *Id*. ¶ 13. According to the complaint, although Muñoz was not interested in purchasing GAP insurance, she decided to pay this cost to complete the transaction, since she had been told that this fee was mandatory as part of Executive Kia's "low income program." *Id*. ¶¶ 14, 18.

In support of her motion for default judgment, Muñoz submitted a copy of the Retail Installment Contract. ECF No. 11-5. On the second page of the document, the following language appears "**GAP PROTECTION: Optional Guaranteed Auto Protection (GAP) is not required to obtain credit.** GAP protection will not be provided under this Contract unless You sign for it below and agree to pay the additional cost shown below . . . . If you want GAP protection, sign below." *Id*. Below this language appears a statement of the cost - $752 – and the term – 54 months, and below that Muñoz's signature and the date. *Id.*

The Executive Kia sales representative also asked Muñoz to provide her checking account information so that the finance company, non-party Credit Acceptance Corporation ("CAC"), could make automatic withdrawals from her bank account.  ECF No. 1 ¶ 15. Although Muñoz did not wish to participate in the automatic withdrawal program, she agreed to do so since the representative indicated that agreeing to automatic withdrawals was required to participate in the "low income program" and receive financing for the transaction. *Id*. ¶¶ 16, 18.

Muñoz completed the transaction, executed the contract documents, and took delivery of the Vehicle. *Id*. ¶ 19. However, shortly thereafter, she "began to experience mechanical problems

2

with the Vehicle in January 2019," *id*. ¶ 20, and asked, at that point and again in July 2019, that Executive Kia either fix the Vehicle or replace it. *Id*. ¶¶ 21, 23.

Muñoz subsequently filed suit, alleging in her complaint violations of the Truth in Lending Act (TILA), the Electronic Funds Transfer Act (EFTA), the Fair Credit Reporting Act (FRCA), and the Connecticut Unfair Trade Practices Act (CUTPA). ECF No. 1. She properly served Executive Kia by delivering the complaint to the "Person in Charge at the Time of Service" at its principal place of business. ECF No. 8. In her motion for default judgment, Muñoz has dropped her FCRA claim and seeks relief for her remaining three claims.  ECF No. 11-1 at 1 n.1.

## II. LEGAL STANDARD

Although "a default constitutes an admission of all the facts 'well pleaded' in the complaint, it does not admit any conclusions of law alleged therein, nor establish the legal sufficiency of any cause of action." *In re Indus. Diamonds Antitrust Litig.*, 119 F.Supp.2d 418, 420 (S.D.N.Y. 2000). It therefore "remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action." *Id.* (internal quotation marks omitted); *see also Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 187 (2d Cir. 2015) ("A court's decision to enter a default against defendants does not by definition entitle plaintiffs to an entry of a default judgment. Rather, the court may, on plaintiffs' motion, enter a default judgment if liability is established as a matter of law when the factual allegations of the complaint are taken as true."). The court must "draw all reasonable inferences in [the moving  party's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

3

Once a court determines that a plaintiff is entitled to a default judgment as a matter of law, it must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnaise Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). "Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true." *Id.* "A district court has the discretion to determine the amount of damages to be included in a default judgment by an evidentiary hearing, detailed affidavits, or documentary evidence." *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 191 (2d Cir. 2006). It is not necessary to hold a hearing on damages as long as the court "ensure[s] that there [is] a basis for the damages specified." *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) (internal quotation marks omitted).

### III. DISCUSSION

Muñoz seeks compensatory damages, punitive damages, and attorneys' fees based on three causes of action. She asserts that **(A)** Executive Kia violated the Truth in Lending Act by including the cost of GAP insurance in the "amount financed," instead of including this fee as part of the "finance charge" for the transaction; **(B)** Executive Kia violated the Electronic Funds Transfer Act by conditioning the loan on Muñoz's paying via preauthorized transfers; and **(C)** Executive Kia's conduct was unfair and deceptive in violation of the Connecticut Unfair Trade Practices Act. I consider each of the Muñoz's causes of action in turn.

### A. Truth in Lending Act

The Truth in Lending Act (TILA) aims to promote "the informed use of credit" and to "protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). The regulations implementing the statute, which are known as "Regulation Z",

4

are codified at 12 C.F.R. § 226. The Act requires creditors to make certain disclosures before extending a loan, and delegates authority to the Consumer Financial Protection Bureau (CFPB) to define the scope and form of the required disclosures. 15 U.S.C. § 1604(a). The information required to be disclosed includes the amount financed and the consumer's right to an itemization of that amount (15 U.S.C. § 1638(a)(2)), the finance charge (15 U.S.C. § 1638(a)(3)), and the annual percentage rate (15 U.S.C. § 1638(a)(4)). By regulation, creditors must make disclosures "clearly and conspicuously in writing, in a form that the consumer may keep." 12 C.F.R. § 226.17. The "amount financed" is calculated by subtracting "any prepaid finance charge" from the "principal loan amount or the cash price" plus "any other amounts that are financed by the creditor and are not part of the finance charge." 12 C.F.R. § 226.18(b). The "finance charge" is "the cost of consumer credit as a dollar amount" and includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or condition of the extension of credit." 12 C.F.R. § 226.4(a).  TILA creates a private cause of action for damages for violations of its terms.  15 U.S.C. § 1640.

Regulation Z addresses items such as GAP insurance, stipulating that such "[c]harges or premiums paid for debt cancellation coverage for amounts exceeding the value of the collateral securing the obligation or for debt cancellation or debt suspension coverage in the event of the loss of life, health, or income or in case of accident **may be excluded from the finance charge** . . . ." 12 C.F.R. § 226.4(d)(3)(emphasis added). However, this exclusion applies only "if three conditions are fulfilled: (1) the lender discloses in writing that debt cancellation coverage is not required; (2) the lender discloses the fee for the initial term of coverage; and (3) the consumer signs or initials an 'affirmative written request for coverage after receiving' these two

disclosures." *Clark v. Drummer Boy Auto Sales, LLC*, No. CIV. 3:06CV01549AWT, 2009 WL 902382, at *2 (D. Conn. Mar. 31, 2009) (citing 12 C.F.R. § 226.4(d)(3)).

The facts in the complaint, taken as true, fail to establish that Executive Kia violated TILA regulations. Muñoz's claim rests on the notion that the oral representation of the sales representative, which was contrary to the written terms of the contract she signed, is enough to negate an otherwise adequate TILA disclosure. I disagree. Muñoz alleges that the defendant included a $752 charge for "GAP insurance" in the Contract, that this fee was a finance charge, and that the defendant's sales representative told her that paying this fee was mandatory in order for Muñoz to finance the balance she owed on the car.  ECF No. 1 ¶¶ 11-12. However, the Retail Installment Contract, ECF No. 11-5, undermines her claim. The Retail Installment Contract states:

> "**GAP Protection: Optional Guaranteed Auto Protection (GAP) is not required to obtain credit**. GAP protection will not be provided under this Contract unless You sign for it below and agree to pay the additional cost shown below and on Line 5F of the ITEMIZATION OF AMOUNT FINANCED. You may obtain optional GAP protection from a person of Your choice that is authorized to sell such coverage and is acceptable to Us. The GAP contract issued by the provider of the protection will describe the terms and conditions of coverage in further detail. If You want GAP protection, sign below."

*Id*. at 2.  Just below this language is the cost ($752), the term of coverage (54 months), and the name of the insurer (Phoenix American Administrators Inc.).  Immediately below that are Muñoz's signature and the date. This succinct paragraph states in bold text that GAP protection is "**not required to obtain credit**" and thus fulfills TILA's requirement of a "clear and conspicuous" disclosure.  It also fulfills the three requirements for excluding "GAP insurance" from the finance charge, i.e., it discloses that GAP insurance is not required, it discloses the fee for the initial term of coverage, and  Muñoz signed the affirmative written request for coverage right beneath these disclosures.  ECF No. 11-5 at 2 ("If You want GAP protection, sign below.").

Muñoz does not claim that the written disclosure was unclear, inconspicuous, or incomplete.  Instead, she asserts that the salesperson's oral statement that GAP insurance *was* required to obtain credit via the "low income" program negated the written disclosure. But Muñoz cites no authority suggesting that compliance with the written disclosure requirements of TILA is insufficient to forestall TILA liability when the defendant makes an oral statement contradicting the written TILA disclosures.  And there is substantial authority to the contrary, albeit none I could find within the Second Circuit.  *See, e.g., Anthony v. Cmty. Loan and Inv. Corp.,* 559 F.2d 1363, 1369–70 (5th Cir.1977) (where disclosure that credit and disability insurance was not required to obtain loan was adequate to satisfy TILA, plaintiff's assertion that she never requested insurance and signed the documents only because she was told to do so was "insufficient to vary the terms of the contract or to negate the creditor's full compliance with the disclosure requirements of Regulation Z," quoting guidance from the Federal Trade Commission stating that "[c]onsumers must learn to inspect disclosure statements before signing a contract, otherwise the purpose of the Act and Regulation Z will be frustrated."); *Nieskens v. Peter,* 2010 WL 1626902, at *3 (D. Minn. April 21, 2010) (holding that TILA does not permit rescission based on theory that oral statements of broker subverted plain language of disclosures)*; Citibank v. Dalessio*, 756 F. Supp. 2d 1361, 1367 (M.D. Fla. 2010) (holding that mortgagor was not entitled to a TILA affirmative defense where mortgagor relied on oral misrepresentations that contradicted the express terms of loan documents); *Ford v. Am. Home Mortg. Corp.,* No. 2:10-CV-53, 2012 WL 2120724, at *3 (E.D. Tenn. May 21, 2012) ("Fatal to plaintiffs' claim … is that TILA applies to written disclosures and does not provide relief based solely on oral representations.").

7

Some of these courts have also relied in part on the parol evidence rule. *Anthony,* 559 F.2d at 1370 (noting that Georgia's parol evidence rule was consistent with the purposes of TILA under these circumstances); *Ford,* 2012 WL 2120724, at *4 ("[T]he parol evidence rule prohibits the plaintiffs from pursuing their TILA claim based on alleged oral misrepresentations indicating that the interest rate was fixed."). In Connecticut, the parol evidence rule, which "prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated written contract," "does not apply . . . if the written contract is not completely integrated." *Benvenuti Oil Co., Inc. v. Foss Consultants, Inc.*, 64 Conn. App. 723, 727 (2001). The Retail Installment Contract in this case does appear to be fully integrated. It is five pages long, addresses the terms of the financing in detail, is signed by both parties, and is initialed on each page by Muñoz. Further, although it does not include a traditional merger clause, which Connecticut courts often treat as conclusive proof that a contract is completely integrated, *id.* at 728-29, it does include the following language: "Any change in the terms of this Contract must be in writing and signed by Us. No oral changes are binding." (ECF No. 11-5 at 4.) That language addresses amendments, not the content of the original deal, but it is further evidence that the intent of the parties was to set down their entire agreement in writing. In the end, however, I need not decide whether the contract is fully integrated and thus whether the parol evidence rule technically applies here, because the issue is not what the terms of the contract were. Instead, the issue is whether the oral statement by the sales representative about GAP coverage being mandatory makes the GAP charge a finance charge, and thus creates TILA liability, even though Executive Kia's clear written disclosures about GAP fully comply with TILA's exclusion for debt cancellation coverage. I conclude that it would be inconsistent with TILA's emphasis on written disclosures to promote the "informed use of credit" to allow a consumer to ignore the clear, conspicuous written terms

of a disclosure by proceeding with a claim based solely on oral statements that contradict the disclosure. Therefore, because the GAP insurance charge meets the criteria set forth in 12 C.F.R. § 226.4(d)(3) to be excluded as a finance charge, and because Muñoz's TILA claim is premised on the notion that the GAP charge is a finance charge, I deny her motion for default judgment as to her TILA claim.

### B. Electronic Funds Transfer Act

The Electronic Fund Transfer Act (EFTA) prohibits any person from conditioning "the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k. A creditor violating this requirement is liable to the consumer for actual damages, statutory damages between $100.00 and $1,000.00, court costs, and reasonable attorneys' fees. 15 U.S.C. § 1693m(a). In assessing the appropriate statutory damages, courts must consider "the frequency and persistence of [the] noncompliance, the nature of such noncompliance, and the extent to which the noncompliance was intentional." 15 U.S.C. § 1693m(b)(1). In this case, Muñoz has established a violation of the EFTA by alleging that "Executive Kia required the Plaintiff to allow CAC [finance company and non-party, Credit Acceptance Corporation] to debit Plaintiff's checking account automatically as a condition of financing." (ECF No. 1 ¶ 29.) Muñoz does not claim any actual damages as a result of Executive Kia's EFTA violation, but she requests the maximum statutory damages of $1,000.00. Muñoz alleges that an employee of Executive Kia told her that, "automatic withdrawals were part of Executive Kia's 'low income program' and that was why she was required to agree to these items if she wished to finance the transaction." (ECF No. 1 ¶ 18.). In her Memorandum of Law in Support for Plaintiff's Motion for Judgment, Muñoz argues that the reference to the "low income program" suggests that, "Executive Kia is employing the same illegal requirement with

9

some or all of its non-prime or subprime borrowers" and that "it is doubtless that the conduct was intentional." (ECF No. 11-1 at 9). Because I agree that this is a reasonable inference to be drawn from the allegation that Executive Kia told her that "automatic withdrawals were part of Executive Kia's 'low income program'" (ECF No. 1 ¶ 18), I find that Muñoz is entitled to statutory damages of $1000.00 plus reasonable attorneys' fees.

## C. Connecticut Unfair Trade Practices Act

Finally, Muñoz seeks damages on her state law claim under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq*. ECF No. 1 ¶ 37. 28 U.S.C. § 1367 permits federal courts to exercise supplemental jurisdiction over state law claims "in any civil action of which the district courts have original jurisdiction." Section 1367(c), however, states that district courts may decline to exercise supplemental jurisdiction over a state law claim in certain circumstances, including where "the claim raises a novel or complex issue of State law" or where it "substantially predominates over the claim or claims over which the district court has original jurisdiction."  28 U.S.C. § 1367(c)(1), (c)(2).

In the present case, I decline to exercise supplemental jurisdiction under § 1367(c)(1) and (c)(2).   As discussed above, the Plaintiff has failed to allege a violation of TILA. *See* Part III.A*., supra*. The Plaintiff's analysis of her CUTPA claim in her brief focuses on the alleged TILA violation.  Specifically, she presents various theories for her CUTPA claim, including that a TILA violation offends public policy, a TILA violation is a *per se* violation of CUTPA, and that, separate from the fact that it allegedly constitutes a TILA violation, forcing consumers to purchase GAP insurance against their will is a *per se* violation of CUTPA since it is in violation of state regulations surrounding the sale of motor vehicles. ECF No. 11-1 at 10-13 (citing TILA, Conn. Gen. Stat. § 14-62(b)(2), and Conn. Agency Reg. § 42-110b-28(b)(23)). But I have found

10

no TILA violation in this case, removing this as a basis for CUTPA liability. *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) ("[w]here a pendent state claim turns on novel or unresolved questions of state law . . . principles of federalism and comity may dictate that these questions be left for decision by the state courts. This is particularly true if the federal claim on which the state claim hangs has been dismissed." (internal quotation marks omitted)). And while the Plaintiff asserts that a violation of EFTA also violates CUTPA (ECF No. 11-1 at 11), she cites no Connecticut case law or other authority that so holds, and acknowledges that "such liability has not previously been considered or recognized." (ECF No. 11-1 at 12). Nor does she provide any real analysis of why this Court should recognize a CUTPA violation on the basis of an EFTA violation that apparently did not cause any actual harm. Not all statutory violations are CUTPA violations, *Normand Josef Enterprises, Inc. v. Connecticut Nat. Bank*, 230 Conn. 486, 524-25 (1994) (bank's "technical violation" of bank execution statute did not violate CUTPA), and I have been unable to find a Connecticut case addressing whether the type of EFTA violation involved in this case should give rise to CUTPA liability. I thus decline to exercise supplemental jurisdiction over the Plaintiff's CUTPA claim on the ground that it raises a novel issue of State law. 28 U.S.C. § 1367(c)(1). In addition, because the CUTPA claim is based on a broader range of conduct than the EFTA claim and because the total of compensatory and punitive damages Muñoz seeks via her CUTPA claim are likely greater than the $1000 I have determined that she is entitled to under the EFTA, (ECF No. 11-1 at 14), the state law claim substantially predominates over the claim over which this Court has original jurisdiction. Therefore, I decline to exercise supplemental jurisdiction over the CUTPA claim on this ground as well. 28 U.S.C. § 1367(c)(2).

The Plaintiff is welcome to pursue her CUTPA theories of liability in the Connecticut state court system, which would be better equipped to rule on these issues.

For these reasons, I deny the motion for default judgment as to CUTPA claim and dismiss that claim without prejudice.

### D. Attorney's Fees

In the event of a successful action to enforce its obligations, EFTA provides for "the costs of the action, together with a reasonable attorney's fee as determined by the court," 15 U.S.C. § 1693m(a)(3). As discussed above, Muñoz has adequately shown a violation of the EFTA. She may submit proof of her fees, in the form of an attorney's declaration and contemporaneous time entries, within 14 days of the date of this ruling. *See New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).

### IV. CONCLUSION

I find that the Muñoz is entitled to $1000.00 in statutory damages under the EFTA, as well as reasonable attorney's fees related to this claim. She has not shown a violation of TILA and this Court declines to exercise supplemental jurisdiction over her CUTPA claim.

IT IS SO ORDERED.

Dated: Hartford, Connecticut
       July 31, 2020

                                                         /s/
                                                Michael P. Shea, U.S.D.J.

12